1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

11   RICHARD EUGENE FARIAS,

12              Petitioner,

13      v.

14   KELLY SANTORO,

15              Respondent.

16

No.  1:15-cv-01619-DAD-JLT (HC)

**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**

**[TWENTY-ONE DAY OBJECTION DEADLINE]**

17          Petitioner is currently serving an indeterminate sentence of 30 years to life plus 5 years for

18   his conviction of gross vehicular manslaughter while intoxicated and felony driving under the

19   influence causing great bodily injury.  Petitioner is proceeding with the instant habeas action

20   claiming: 1) The trial court erred by allowing an expert to testify as to the theory of Retrograde

21   Alcohol Extrapolation related to Petitioner's blood alcohol content at the time of the accident; 2)

22   Defense counsel rendered ineffective assistance by failing to properly object to the admission of

23   the expert testimony; and 3) The trial court abused its discretion by imposing consecutive

24   sentences.  As discussed below, the Court finds the claims to be without merit and recommends

25   the petition be **DENIED.**

26   **I.       PROCEDURAL HISTORY**

27          Petitioner was convicted in the Madera County Superior Court on November 20, 2012, of

28   two counts of gross vehicular manslaughter while intoxicated (Cal. Penal Code § 191.5(a)), one

1

count of driving while under the influence causing injury (Cal. Vehicle Code § 23153(a), and one count of driving with a blood alcohol content of 0.08 percent or greater causing injury (Cal. Vehicle Code § 23153(b)).  People v. Farias, No. F066500, 2014 WL 6066121, at *1 (Cal. Ct. App. 2014).  The jury also found true the special allegations that Petitioner had a prior conviction for driving under the influence and that he had caused great bodily injury to a victim.  Id.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA").  The Fifth DCA affirmed the judgment on November 14, 2014.  Id.  Petitioner filed a petition for review on December 26, 2014, in the California Supreme Court.  (LD[1] 29.)  The petition was summarily denied on January 28, 2015.  (LD 30.)

On October 26, 2015, Petitioner filed the instant petition for writ of habeas corpus in this Court.  (Doc. No. 1.)  Respondent filed an answer on March 8, 2016.  (Doc. No. 18.)  Petitioner filed a traverse to Respondent's answer on June 27, 2016.  (Doc. No. 24.)

**II.    FACTUAL BACKGROUND**

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[2]:

> On the afternoon of November 13, 2010, Valentino Valdez and Marcel Rodriguez walked to a liquor store in Madera. [N.1] They saw defendant at the store. Valdez reminded defendant that he was his neighbor and asked defendant for a ride home. Defendant agreed and invited them into his car, a 1994 Jaguar XJ6 four-door sedan.
>
>> [N.1] Defendant and Valdez were the only survivors of the crash. Valdez testified for the prosecution, admitted he was on probation for prior felony convictions, and that he had problems with alcohol and drugs. Valdez failed to appear on the scheduled day of his testimony because he was afraid he would be arrested for an unrelated probation violation. When Valdez was recalled as a rebuttal witness, he admitted he had been taken into custody for that violation.
>
> Deborah Lyon, defendant's friend, was sitting in the front passenger seat. Valdez sat in the rear driver's side seat, and Rodriguez sat on the rear passenger side. Valdez could not find any seatbelts in the back seat.
>
> Valdez complimented defendant on his car. Defendant said the Jaguar had a special passing gear called a "slapstick" shifter, and it "just makes the car jet, like from 50 to maybe 90 or 100, real quick." Valdez testified defendant did not appear

---

[1] "LD" refers to documents lodged by Respondent.

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

to be under the influence of alcohol.

Valdez testified defendant was supposed to drive him home. Instead, defendant drove in the opposite direction and into the country. The radio was loud and Valdez could not talk to defendant to ask where he was going.

### The crash

Valdez testified defendant was driving approximately 50 to 55 miles per hour on the two-lane road. Defendant passed at least three cars which were traveling in front him. A black BMW passed defendant on the left side, and it was going about 55 or 60 miles per hour. Valdez thought defendant turned and said something to the BMW's driver as the car passed him.

Valdez testified defendant suddenly "hit[ ] the gas" and accelerated. Valdez looked at the speedometer over defendant's shoulder, and the needle bounced between 100 and 110 miles per hour. Valdez again looked for a seatbelt and could not find it.

Valdez testified defendant came upon a slow-moving vehicle which was traveling in the same lane in front of him. Defendant suddenly applied the brakes, and Valdez felt the front of the car start shaking.

Valdez testified defendant lost control of the Jaguar. It fishtailed, veered off the road, became airborne, and flipped. Valdez desperately held onto the seat, but he was ejected. The Jaguar flipped in the air, crashed onto the ground, rolled several times, and finally landed in an alfalfa field.

### The witnesses

Joey Rodriguez, Philip Rodriguez, and Lorena Bravo were traveling in a black BMW sports car on Avenue 14. Joey Rodriguez was driving about 45 to 50 miles per hour. The speed limit was 55 miles per hour. At some point, Rodriguez got in front of defendant's Jaguar.

As they continued on Avenue 14, Bravo heard a car come up behind them, and Philip said the car was going to crash. Bravo heard the tires lock as if the driver hit the brakes. Bravo turned and looked through the BMW's rear window, and saw the Jaguar "coming toward us very fast and I thought they were gonna hit us."

Bravo testified the Jaguar was going over 70 miles per hour. She watched as the Jaguar flipped into the air, spun at least twice, hit the ground, and rolled over several times. Bravo saw one person ejected from the car as it was in the air.

Bravo and her companions immediately stopped, called 911, and then ran to the Jaguar. A body was lying near the car. The driver had gotten out of the car and was holding his bloody head. They told the driver to sit down, which he did.

Sandra Gonzalez was also driving on Avenue 14 and noticed the Jaguar was traveling "really quick" and "tried to pass." The car appeared to hit the dirt and gravel on the shoulder. The car became airborne and flipped several times, and someone was ejected from the car.

### The scene

At approximately 3:00 p.m., California Highway Patrol Officer Isler responded to

the scene at Avenue 14, west of Road 23. The Jaguar was in an alfalfa field and on its wheels, but had substantial damage from rolling over numerous times. Isler described the roadway as straight and completely flat, the pavement was very good, and there were no hazards on the road such as oil or water.

Valdez had been ejected from the car, but he was conscious and survived. He was in tremendous pain in the area of his ribs and back.

Rodriguez also had been ejected from the car and he was lying in the field. He was dead at the scene from crushing injuries to his head and body.

Lyon was still buckled into the front passenger seat. Her head was split open and she was dead at the scene from massive head and brain injuries.

Defendant was sitting sideways in the driver's seat. He was conscious and suffered a head injury. Officer Isler briefly spoke to defendant and asked for his name, whether he was driving, and what happened. Defendant identified himself. Defendant said it was his car, and something hit the windshield and he lost control.

Officer Isler only spoke to defendant for a minute. He stood a couple of feet away and did not detect the odor of alcohol from defendant. Defendant was bleeding from a laceration to his skull. The medical personnel arrived and Isler stepped away for defendant to receive treatment. Defendant and Valdez were taken to the hospital.

### Defendant's statements at the hospital

Around 4:45 p.m., Officer Isler spoke to Valdez at the hospital and obtained his statement about what happened. Valdez had suffered fractured ribs and dislocated fingers and was in the hospital for three days.

After he spoke to Valdez, Officer Isler spoke to defendant in the emergency room. Defendant was lying on a stretcher. He was wearing a neck collar, and his head injuries were bandaged. Isler again asked defendant if he was driving and how the collision happened. Defendant said he was driving, Lyon was in the front seat, and the two men were in the back seat. They were going to a friend's house. Defendant said something struck his windshield, but he was not sure what it was. He thought it might have been a bird. Defendant said he lost control, and the car rolled over.

As they talked, Officer Isler noticed defendant's eyes were watery and bloodshot, which was not unusual after having been in that type of collision. However, Isler also smelled an odor of alcohol from defendant. He moved closer to defendant as he was talking, and realized the odor was coming from defendant's mouth. He was close enough to defendant's mouth to "get a good sniff of the alcohol that was coming out of his breath." Isler described the alcohol odor as "moderate to weak ... it wasn't strong. I just could smell it coming from his breath, from past experience. [A]nd I could tell it probably wasn't beer either," because "hard liquor has a different smell than beer."

After smelling the alcohol, Officer Isler performed the horizontal gaze nystagmus test on defendant and asked him to follow his finger with his eyes. Based on defendant's reaction, Isler believed he was under the influence of alcohol. Isler was unable to perform any physical field sobriety tests because of defendant's condition.

Officer Isler advised defendant of the Miranda warnings and asked if he had eaten anything. Defendant said he had sausage and eggs. Isler asked if he drank anything. Defendant said he had one shot of gin at his house at 11:00 a.m. Defendant said he also took a 750–milligram Vicodin pill that morning but claimed he did not feel any effects from it.

At 4:52 p.m., defendant agreed to perform a Preliminary Alcohol Screening (PAS) breath test, and the result was 0.074 percent.

Officer Isler testified he was "convinced" and there was "no doubt in my mind" that defendant was under the influence of alcohol. Isler arrested defendant for driving under the influence.

At 5:15 p.m., a blood sample was taken from defendant, and his blood-alcohol content was determined to be 0.08 percent.

***The investigation***

CHP Officer Nicholas Haltom investigated the crash scene and found multiple tire friction marks on the pavement. After the final friction mark, the vehicle became airborne for 110 feet, hit the ground, flipped and rotated through the air an unknown number of times, and crashed into the field. The car finally stopped approximately 240 feet from the last friction mark on the pavement.

Officer Haltom could not determine how many times the car flipped over. However, there were several points of impact on the pavement and in the field, which showed where the car hit the ground and then flipped back into the air. There was massive damage on all sides of the car. Haltom testified the car was definitely traveling faster than the speed limit of 55 miles per hour.

Officer John Kolter examined the Jaguar and determined that while there was massive damage to the car's body from the crash, there was no evidence of a mechanical defect that would have caused the driver to lose control. He did not see any evidence of anything hitting or cracking the windshield before the crash occurred.

Officer Kolter testified the car's brake rotors were undersized and too thin. The vehicle had sensors to trigger a dashboard light when there were problems with brake friction, but the sensor wires had been cut and tied off to turn off the light. Nevertheless, the driver would have known about the brake problem by feeling vibrations when using the brakes. The worn brakes would not have affected the driver's ability to drive the car or caused the car to go out of control. [N.3] There were functioning seatbelts in the back seat.

> [N.3] Valdez testified that when defendant suddenly applied the brakes just before the crash, Valdez felt the front of the car start to shake. Defendant testified he had owned his Jaguar for seven or eight years, he usually kept it in storage because the insurance was so high, and he did not know the brake sensor wires had been altered.

After inspecting the scene and the incident report, Officer Kolter testified to his opinion that the Jaguar was traveling at 74 miles per hour at the time of the crash. Kolter testified the crash was caused by defendant's recklessness and excessive speed.

*Expert testimony*

Ricardo Deslate, a criminalist with the Department of Justice, testified about "retrograde extrapolation," which is the process of determining "alcoholic concentration in a person's system based on a test result that was performed a little bit later." [N.4] The variables included the time the last drink was consumed and how many drinks were consumed with a certain period, compared to the time of the incident.

> [N.4] As we will explain in issue I, post, an expert who testifies about "retrograde extrapolation" starts with an individual's blood-alcohol content at the time of the chemical test, and uses circumstantial evidence and various factors to determine the person's blood-alcohol content at the time that person was driving. (*People v. Warlick* (2008) 162 Cal.App.4th Supp. 1, 7, fn. 2.)

Deslate testified that 90 percent of the alcohol in a person's system is metabolized by enzymes produced by the liver. The "metabolic rate, burn off rate," is an average of 0.02 per hour. "That means if you have 0.02 alcohol in your system, you will get rid of it in one hour. That's equivalent to about one drink in about [a] 150, 170–pound man." Deslate testified that was an average, some are lower and some are higher, and the range of burn off is "between .015 to .025 ... grams percent per hour."

In response to the prosecutor's series of hypothetical questions, Deslate testified about what the blood-alcohol content would be at 3:00 p.m., for a man who was five feet eight inches tall and weighed 175 pounds based on facts similar to this case, assuming his blood-alcohol content was 0.08 percent at 5:15 p.m., using retrograde extrapolation and different burn-off rates. [N.5] Deslate testified that using an average burn-off rate of 0.02 grams per hour, such a person would have had a blood-alcohol content of 0.12 percent at 3:00 p.m. Deslate used the same formula with a burn-off rate of 0.025 grams per hour, and testified the person's blood-alcohol content would have been 0.13 percent at 3:00 p.m. With a burn off rate of 0.015 grams, the person's blood-alcohol content would have been 0.11 percent.

> [N.5] Officer Isler testified defendant's driver's license said he was five feet eight inches tall and weighed 175 pounds.

The prosecutor asked Deslate to assume the man's blood-alcohol content was 0.07 percent at 5:15 p.m., and to use a burn-off rate of 0.015. Deslate testified the man's blood-alcohol content would have been 0.10 percent at 3:00 p.m. under that hypothetical.

Deslate explained that if a person's blood sample was preserved and tested at a later time, the blood-alcohol result would be different at a rate of 0.01 to 0.02 percent because of the volatility of alcohol in the blood. Deslate also explained that PAS tests result in lower blood-alcohol results approximately 85 percent of the time because "you don't really get 100 percent of deep lung air."

Defense counsel asked Deslate to determine the hypothetical man's blood-alcohol content at 3:00 p.m. using the burn off rate of 0.025, based on a blood-alcohol content of 0.07 percent at 5:15 p.m. Deslate testified it would be 0.12 percent. Defense counsel asked him to use the same hypothetical with a burn off rate of 0.01 percent. Deslate explained the blood-alcohol content would be 0.022 percent.

In the same hypothetical, Deslate testified the blood-alcohol content would be 0.011 percent using a burn off rate of 0.02 percent.

### Defendant's prior DUI

The prosecution introduced evidence of defendant's prior conviction in 2004 for driving with a blood-alcohol content of 0.08 percent or greater. The conviction was based on a crash in March 2004. Anthony Tates and his family were in a pickup truck at the intersection of Avenue 14 and Road 23, where there was a four-way stop sign. Tates suddenly saw a small pickup truck heading toward him. Defendant, who was driving the truck, ran the stop sign, his truck flew through the intersection, and he hit Tates's truck in a "T–Bone." Defendant hit Tates's truck with such force that heavy construction supplies were thrown out of the bed of Tates's truck. Tates's head hit the windshield, his nephew's knees were pinned under the dashboard, and his daughter, who had been in the extended rear cab, was pinned under the seat. Tates and his nephew had to pry his daughter out of the truck.

Officer Brian Wendland interviewed defendant at the scene. Defendant said he was driving on Road 23, but a car stopped right in front of him, and he could not stop in time. He swerved to the right and hit Tates's truck. After administering field sobriety tests, Wendland arrested defendant at the scene for driving under the influence of alcohol.

Tates testified he attended all of the court hearings for defendant's criminal charge. At the sentencing hearing, defendant looked at Tates and he "was mad-dogging me."

### DEFENSE EVIDENCE

Dr. Alan Barbour, a forensic alcohol supervisor at Central Valley Toxicology, retested defendant's blood sample and obtained blood-alcohol results of 0.070 and 0.071 percent. The error rate was plus-or-minus 0.01 percent, which meant his blood-alcohol content could have as low as 0.06 percent or as high as 0.08 percent at 5:15 p.m., two hours after the crash.

### Defendant's testimony

Defendant testified that on the morning of the crash, he woke up around 9:00 a.m. and took a 600– or 750–milligram Vicodin pill for knee pain. At around 10:00 a.m., he ate a hamburger and a couple of eggs for breakfast. At around 11:00 a.m. or 11:30 a.m., he was cleaning the kitchen and noticed a bottle of gin that his guests had left from the previous night. There were one or two shots left in the bottle. Defendant decided it was not worth putting away the bottle so he drank the remaining gin. He also drank a glass of water. He did not feel any effect from the gin.

Around 12:30 p.m., defendant drove his Jaguar to Deborah Lyon's house. Lyon was upset about a family matter, so they drove around for about 20 minutes and talked. They stopped at a liquor store for cigarettes, and defendant saw Valdez and Rodriguez. Defendant agreed to give them a ride.

Defendant confirmed that he told the two men about the Jaguar's automatic transmission "slap stick" shifter, which made his car "a little more special." If he was driving in the automatic position, he could press a button "and if the need

7

arises to get by a vehicle a bit faster, for passing, you press this button and you slap the stick over. And you shove it into second or third, and you shift it just like you would a clutch-operated vehicle, and you watch your RPMs in order to switch gears."

Defendant testified he began driving, and he was daydreaming. He drove in the opposite direction from his house. He accelerated to 80 miles per hour even though the speed limit was 55 miles per hour. He used the slap shifter to pass one car; he crossed into the opposite lane, passed the car, and returned to his lane. He passed a second car by again crossing into the opposite lane, but he did not use the slap shifter. After he passed the second car, he tapped the brakes to slow down to 60 miles per hour and return to his lane. Defendant testified something "jerked" on the Jaguar's front left side, and he thought a tire blew out. He lost control and the car flipped into the air.

Defendant testified he could not remember anything else because of the head injury he suffered in the crash. On further questioning, however, defendant recalled that a black BMW passed him before the crash. Defendant denied that he tried to race it. He admitted that he accelerated after the BMW was "way up ahead of us," but "not for the purpose of trying to catch that vehicle."

Defendant testified he did not tell the officer at the scene that a bird hit his window. Instead, he asked the officer if that was what happened. Defendant could not remember speaking to the officer at the hospital.

Defendant admitted he pleaded no contest to driving with a blood-alcohol content of 0.08 percent or greater in 2004, based on the incident where Tates and his family were injured. He was placed on probation. Defendant believed his blood-alcohol content was 0.08 percent. On further questioning, however, defendant conceded his blood-alcohol content was 0.10 percent in the 2004 crash.

The prosecution introduced evidence that when defendant was placed on probation for the 2004 conviction, he was admonished that if he continued to drive while under the influence of alcohol or drugs or both, and as a result of his driving someone was killed, he could be charged with murder. Defendant testified he did not recall being advised of that warning by the court, his attorney, or the probation officer. [N.6]

> [N.6] Based on the 2004 admonishment and the other evidence in this case, defendant was charged with the murder of the two victims in this case. However, the jury advised the court it was hopelessly deadlocked on the murder charges, and instead convicted defendant of two counts of gross vehicular manslaughter while intoxicated. The foreperson later advised the court that the jury had been split 11 to one in favor of convicting defendant of the two murder charges. The prosecution subsequently dismissed the two murder counts.

Defendant admitted that in 2002, he was arrested for being drunk in public at the Millerton marina. The charges were later dropped.

Farias, 2014 WL 6066121, at *1–7.

## III.   DISCUSSION

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Madera County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards

9

set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'"  Cullen v. Pinholster, 563 U.S. 170, 203 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings.  Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997).  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.      Review of Claims

The instant petition presents the following grounds for relief: 1) The trial court committed reversible federal constitutional error by allowing a prosecution expert to improperly testify as to

10

the unreliable and unscientific theory of Retrograde Alcohol Extrapolation concerning

Petitioner's blood alcohol content at the time of the accident; 2) Defense counsel rendered

ineffective assistance by failing to properly object to the admission of the expert testimony; and

3) The trial court abused its discretion by imposing consecutive sentences.

> 1.     Trial Court Error – Admission of Expert Testimony

Petitioner first alleges the trial court erred by allowing the prosecution's expert to testify

regarding Petitioner's blood alcohol level at the time of the accident using the unreliable and

unscientific theory of Retrograde Alcohol Extrapolation.  Petitioner presented this claim on direct

review.  The Fifth DCA rejected the claim, as follows:

> **I.   *The court properly admitted the expert testimony about retrograde extrapolation***
>
> Defendant contends the court should have completely excluded all aspects of Deslate's testimony about retrograde extrapolation because it is an unreliable and unscientific theory, there was no scientific foundation for his opinions, his opinions were not based on defendant's individual characteristics, and the admission of the evidence violated his due process rights.
>
> As we will explain, defense counsel raised very specific and narrow objections to Deslate's expert testimony, the court conducted an evidentiary hearing to address these objections, and both the court and defense counsel agreed Deslate could testify about retrograde extrapolation. Defendant never raised the objections that he now makes on appeal. In order to avoid this omission, defendant alternatively contends defense counsel was prejudicially ineffective for failing to preserve his due process objections to the unreliability of retrograde extrapolation. These arguments are meritless.
>
> ### *A. Defendant's motion in limine*
>
> We begin with defendant's pretrial motion in limine, which sought to exclude certain evidence of retrograde extrapolation as follows.
>
>> "Exclude any evidence of retrograde extrapolation where the opinion states that alcohol is eliminated *at a rate of 0.02% per hour* on the following grounds: improper opinion, lack of foundation, undue prejudice (Evid.Code, § 352), and on the grounds that admission of *that opinion* would violate defendant's right to due process and a fair trial under the U.S. and California Constitutions." (Italics added.)
>
> During pretrial motions, defense counsel conceded that "the case law says that retrograde extrapolation is a legitimate prosecution tool in support of circumstantial evidence with regard to what the BAC may have been at the time of the driving." Defense counsel clarified the nature of his motion to exclude:
>
>> "[A]ny *blanket statement* by any expert that alcohol is eliminated at a rate of *.02 percent* per hour *because that particular assertion is completely*

*lacking any foundation*. I believe there's [a] formula that is used to determine what a person's BAC may have been at a prior time to the time the test was taken. *But to allow someone to testify with regard to a number without any further foundation I think would be prejudicial and would be false because, you know, we are all human beings, we are all different, biology works differently*." (Italics added.)

The court asked the prosecutor for an offer of proof regarding the proposed testimony of Deslate, the prosecution's expert. The prosecutor replied Deslate would give his opinion "based upon a formula that he uses and the blood alcohol content given at a certain time and full absorption at a certain time within a hypothetical. So the formula and the calculation they use is really supporting his own opinion. To limit my expert in this way would be limiting his opinion improperly...."

## B. The evidentiary hearing

The court conducted an evidentiary hearing (Evid.Code, § 402) to address the admissibility of Deslate's expert testimony about the burn-off rates. Defense counsel stated that for the purpose of the evidentiary hearing, there was "nothing in the CV that would indicate he wouldn't qualify as an expert."

Deslate, a senior criminalist with the Department of Justice, testified retrograde extrapolation is "the process of determining the amount of alcohol in a person's system based on a test ... that was conducted at a later time. So you want to go back to a certain time to determine what the amount of alcohol that's in an individual's system based on a result of a test that is conducted a little bit later, later than the time you want the alcohol to be determined."

Deslate explained that to make this calculation he had to use a figure "that we normally consider to be an average burn off. By that I mean the amount of alcohol that our body metabolizes or gets rid of per hour." There was a range which could be as low as 0.015 to 0.025 grams percent alcohol per hour, "that's where you got the average of 0.02 grams per hour is derived. Some people would argue that it's actually .0175. The difference is minuscule, so if you want me to use the average that's fine too. But for purposes of me answering your question, I'm going to use .02 as the average."

The prosecutor asked Deslate about the source of the figures for the burn-off range:

"The very first time I learned about burn off was back in 1991. I attended and completed a five-day course called Forensic Alcohol Supervisor Course. Parts of those presentations involved burn off or metabolism of alcohol.

"Over the years I have read and digested and learned numbers from published studies conducted by experts in the field, as far as burn off is concerned. And, also, I have participated in approximately about nine correlation studies, nine forensic alcohol correlation studies, where determining the burn off rate was also included.

"Based on those published studies done with other people and my own participation in forensic alcohol studies, I have formed the opinion that the rate of burn off per hour is .02 as an average, and has a range of .015 and .025."

12

On cross-examination, Deslate testified numerous studies were the basis for his opinion about the range.

> "Q. Now, is it your testimony that nobody will have burn off at either more than or less than the range that you've provided?
>
> "A. I said that's the reasonable range. Is it possible for individuals to have a burn off that is very, very low? Yes. Particularly, if you are dealing with somebody who has liver damage and cannot produce the enzymes that are responsible for metabolizing alcohol.... [¶] But the range I'm talking about are of those who are considered normal, without medical conditions that would affect that particular aspect of physiology of alcohol."

Defense counsel clarified what Deslate would testify about:

> "Q. Now, the reason we're having this hearing is you're not gonna testify that burn off is .02 percent for everybody, are you?
>
> "A. As I said earlier, I use that as an average. I'm not saying that everyone is a burn off rate of .02. *But because I don't have somebody's burn off rate when I'm being asked of it, I have to use that to arrive at the number. If you want to me use a number between that range, that's fine by me.*
>
> "Q. Okay. Well, so you're just saying that's an average and that's what you use, right?
>
> "A. Yes.
>
> "Q. *Okay. But that's not the definitive burn off rate for any particular individual, right*?
>
> "A. *No.*" (Italics added.)

Deslate further testified that among his colleagues, "everyone in the laboratory" used 0.02 as the average, but they also agreed the average burn-off range could be 0.015, 0.0175, and/or 0.025.

At the conclusion of the hearing, defense counsel stated his motion had been to exclude "any testimony that said that .02 is the number" for the burn-off rate, and "I don't think that there's a problem" in light of Deslate's testimony. The court agreed that given Deslate's explanation, it would allow his testimony on retrograde extrapolation.

### C. *Deslate's trial testimony*

We have already set forth Deslate's trial testimony above. On cross-examination, defense counsel extensively cross-examined Deslate about the scientific studies regarding burn-off and correlation rates, to explain the formulas he used for retrograde extrapolation, and explain there are variables inherent in each person when determining the burn off rate.

In closing argument, the prosecutor argued Deslate's testimony about retrograde extrapolation was very important, and summarized Deslate's explanations about burn off rates and blood-alcohol contents. The prosecutor acknowledged there was

a range for the burn off rate, but defendant's blood-alcohol level was still over 0.08 percent at 3:00 p.m. using the lower figure in that range. The prosecutor argued that even giving defendant the benefit of a doubt, and assuming his blood-alcohol content was 0.07 percent at 5:15 p.m., it would have been 0.10 percent at the time of the crash.

Defense counsel used closing argument to undermine the accuracy of the results from the breath and blood tests, and Deslate's testimony about burn off rates and retrograde extrapolation formulas.

### D. Analysis

Defendant contends the court abused its discretion and violated his due process rights by admitting any evidence about retrograde extrapolation testimony because Deslate did not know defendant's individual burn-off rate. Defendant contends that in the absence of such a figure, retrograde extrapolation is an unreliable and unscientific theory and there was no scientific foundation for Deslate's opinions.

To the contrary, retrograde extrapolation has been found admissible in this state. "Retrograde extrapolation" is a method of introducing expert opinion, based on circumstantial evidence, to determine a person's blood-alcohol content at the time that person was driving. (*People v. Warlick, supra*, 162 Cal.App.4th Supp. at p. 7.) "'[R]etrograde extrapolation' is nothing more than the prosecutorial version of the ''rising blood-alcohol' defense.' [Citation.] Each starts with the defendant's blood-alcohol level at the time of chemical test and relies on circumstantial evidence regarding the direction of change to convince the trier of fact that the level was different—significantly higher or lower—at the time of driving." (*Id.* at p. 7, fn. 2.)

The California Supreme Court has recognized the validity and admissibility of expert testimony on retrograde extrapolation. (See, e.g., *People v. Clark* (1993) 5 Cal.4th 950, 993, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Thompson* (2006) 38 Cal.4th 811, 826 (maj. opn. of Baxter, J.); *id.* at p. 834 (dis. opn. of Werdegar, J.). "It is common ... for experts to take into account the metabolization rate of a substance and extrapolate from the amount of a substance in a blood sample to arrive at an opinion regarding the amount of the substance in the blood at a critical point in time...." (*People v. Clark, supra*, 5 Cal.4th at p. 993.) The Supreme Court has further explained that while such extrapolations may be speculative because "'[t]here are numerous variables such as weight, or time and content of last meal which may affect the rate at which the alcohol dissipates,' [citations.]" such issues go to the weight rather than the admissibility of the expert testimony. (*People v. Thompson, supra*, 38 Cal.4th at p. 826 (maj. opn. of Baxter, J.), fn. omitted; see *id.* at p. 834 (dis. opn. of Werdegar, J.).)

In this case, the court did not abuse its discretion or violate defendant's due process rights by permitting Deslate to testify about his opinions about retrograde extrapolation. Such expert opinion evidence has been held admissible by our Supreme Court. Moreover, defendant's pretrial objections were not aimed at the general reliability or scientific basis for this expert testimony. Instead, defendant's motion and hearing objections were to any evidence about a "blanket" burn-off rate of 0.02 percent. At the evidentiary hearing, Deslate explained the range of opinions on average burn-off rates and, in response to defense counsel's questions, clarified that he would not testify that 0.02 percent was the burn-off rate for everyone. Defense counsel was satisfied with his offer of proof. The court agreed

and held Deslate could testify.

As the Supreme Court has explained, variations in the calculation are addressed to the weight rather than the admissibility of expert opinion on retrograde extrapolation. That is exactly what happened in this case. At trial, Deslate repeated his hearing testimony and explained the average range of burn-off rates. He responded to numerous hypothetical questions proposed by both the prosecutor and defense counsel using different assumptions regarding burn-off rates and blood-alcohol contents. Defense counsel extensively cross-examined Deslate about the basis for his assumptions and opinions about these issues. The jury was clearly aware that there were different possibilities for burn-off rates and the variables in the calculation.

Defendant never argued Deslate's expert testimony on retrograde extrapolation was unreliable or lacked any scientific basis because he did not know defendant's individual burn-off rate. On appeal, however, defendant asserts he preserved this issue because his pretrial motion in limine asserted such evidence would violate his due process rights. While defendant's motion raised due process as an issue, it expressly based that objection on the possibility Deslate would testify to his opinion that the burn-off rate was 0.02 percent for everyone. At the evidentiary hearing, defense counsel conceded that "the case law says that retrograde extrapolation is a legitimate prosecution tool in support of circumstantial evidence with regard to what the BAC may have been at the time of the driving," and explained his motion sought to exclude any "blanket statement" that 0.02 percent was the burn-off rate for everyone because "we are all different." Defendant's due process argument did not incorporate objections to the general reliability of retrograde extrapolation.

Farias, 2014 WL 6066121, at *7–11.

a. Procedural Default

As an initial matter, Respondent contends that the claim is procedurally barred because no contemporaneous objection was made at trial. The Court agrees.

A federal court will not review a claim of federal constitutional error raised by a state habeas petitioner if the state court determination of the same issue "rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). This rule also applies when the state court's determination is based on the petitioner's failure to comply with procedural requirements, so long as the procedural rule is an adequate and independent basis for the denial of relief. Id. at 730. For the bar to be "adequate," it must be "clear, consistently applied, and well-established at the time of the [ ] purported default." Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997). For the bar to be "independent," it must not be "interwoven with the federal law." Michigan v. Long, 463 U.S. 1032, 1040-41 (1983). If an issue is procedurally defaulted, a federal court may not consider it

15

1    unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

2    alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

3    fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50.

4         In Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002), the Ninth Circuit held that

5    California's contemporaneous objection doctrine is clear, well-established, and has been

6    consistently applied when a party has failed to make any objection to the admission of evidence.

7    In Vansickel v. White, 166 F.3d 953 (9th Cir. 1999), the Ninth Circuit held that the

8    contemporaneous objection bar is an adequate and independent state procedural rule.  In this case,

9    Petitioner did not object to the general use of retrograde extrapolation as being unreliable or

10   lacking in any scientific basis.  Further, Petitioner has not demonstrated cause for the default or

11   actual prejudice resulting therefrom.  Thus, the claim is procedurally defaulted.

12              b.  Legal Standard and Analysis

13        A federal court in a habeas proceeding does not review questions of state evidence law.

14   Our inquiry is limited to whether the evidence ruling "resulted in a decision that was contrary to,

15   or involved an unreasonable application of, clearly established Federal law, as determined by the

16   Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Therefore, habeas relief is

17   unavailable for Petitioner's claim that the admission of the expert's testimony violated state

18   evidentiary law.

19        With respect to the admission of evidence, there is no Supreme Court precedent governing

20   a court's discretionary decision to admit evidence as a violation of due process.  In Holley v.

21   Yarborough, the Ninth Circuit stated:

22        The Supreme Court has made very few rulings regarding the admission of
          evidence as a violation of due process. Although the Court has been clear that a
23        writ should be issued when constitutional errors have rendered the trial
          fundamentally unfair, [Citation omitted.], it has not yet made a clear ruling that
24        admission of irrelevant or overtly prejudicial evidence constitutes a due process
          violation sufficient to warrant issuance of the writ. Absent such "clearly
25        established Federal law," we cannot conclude that the state court's ruling was an
          "unreasonable application."  [Citation omitted.]  Under the strict standards of
26        AEDPA, we are therefore without power to issue the writ . . . .

27   Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); see Moses v. Payne, 555 F.3d 742,

28   760 (9th Cir. 2008) (holding that trial court did not abuse its discretion in excluding expert

                                                    16

testimony "[b]ecause the Supreme Court's precedents do not establish a principle for evaluating discretionary decisions to exclude the kind of evidence at issue here").  Since there is no clearly established Supreme Court precedent governing a trial court's discretionary decision to admit evidence as a violation of due process, habeas relief is foreclosed.  Id.  Therefore, Petitioner cannot demonstrate that the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d).

Nevertheless, there can be habeas relief for the admission of evidence when the evidence "is so extremely unfair that its admission violates fundamental conceptions of justice."  Perry v. New Hampshire, 565 U.S. 228, 237 (2012).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation.  Id. at 920.  Here, Petitioner has failed to show that no permissible inferences existed that the jury might draw from the challenged evidence; accordingly, the claim does not rise to the level of a federal constitutional claim and is therefore merely an issue of state law that is not cognizable in these proceedings.  Moreover, the challenged evidence was relevant and probative of various elements of the offenses with which Petitioner was charged.  For the foregoing reasons, the claim should be denied.

2.    Ineffective Assistance of Counsel

In a related claim, Petitioner faults defense counsel for failing to object and therefore preserve his due process claim discussed above.  This claim was also presented on direct appeal and rejected by the Fifth DCA in a reasoned decision, as follows:

> In the alternative, defendant contends defense counsel was prejudicially ineffective for failing to preserve these issues below. To prevail on an ineffective assistance claim, "defendant must first show that '"counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms."' [Citation.] Second, defendant must show that the inadequacy was prejudicial, that is, '"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."' [Citation.] [¶] If 'counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed.' [Citation.] When, however, the record sheds no light on why counsel acted or failed to act in the manner challenged, the reviewing court should not speculate as to counsel's reasons. To engage in such speculations would involve the reviewing court '"in the perilous process of second-guessing."' [Citation.] Because the appellate record ordinarily does not show the reasons for defense counsel's actions or omissions, a

claim of ineffective assistance of counsel should generally be made in a petition for writ of habeas corpus, rather than on appeal. [Citations.]" (*People v. Diaz* (1992) 3 Cal.4th 495, 557–558.)

Defendant asserts the court would have been compelled to grant a defense motion to completely exclude all evidence of retrograde extrapolation because such evidence has been questioned by the California Supreme Court and the courts of other states. As we have explained, however, the California Supreme Court has held such evidence is admissible and that variations go to the weight rather than the admissibility of the expert opinion testimony. (*People v. Thompson, supra*, 38 Cal.4th at p. 826 (maj. opn. of Baxter, J.), *id.* at p. 834 (dis. opn. of Werdegar, J.).) As for other jurisdictions, decisions of sister state courts are not binding on California courts, and only have persuasive value where the issues raised involve conflicting policies and the case is one of first impression in California. (*Savett v. Davis* (1994) 29 Cal.App.4th Supp. 13, 16, fn. 2.) The admissibility of retrograde extrapolation has been settled by the California Supreme Court and we are bound by those holdings. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

As for the cases cited by defendant from other states, these opinions found evidence of retrograde extrapolation is generally reliable and admissible, but faulted the failure of the experts in those cases to set forth the foundational basis for their opinions. None of these cases held the expert must know the individual's particularized burn-off rate. For example, in *United States v. DuBois* (8th Cir.1981) 645 F.2d 642, the court held the expert's testimony on retrograde extrapolation was speculative because the defendant had consumed an unknown amount of alcohol between the time he was driving, and when he was taken into custody and given a breath test. (*Id.* at p. 645.) In so holding, however, the court acknowledged the reliability and admissibility of expert testimony about retrograde extrapolation under the appropriate circumstances:

> "If a defendant is placed in custody immediately after an accident and remains under the control of officers or others and consumes no more alcohol before the test is given, a conviction may be based upon the test results and expert testimony estimating the blood alcohol level at the time of the accident. See, e.g., *State v. Parson*, 226 Kan. 491, 601 P.2d 680, 683 (1979); *State v. Hendrickson*, 240 N.W.2d 846, 853 (N.D.1976); *Toms v. State*, 95 Okl.Cr. 60, 239 P.2d 812, 820 (1952). See generally McCormick's Handbook of the Law of Evidence, § 209 at 512 (2d ed.1972). See also *Ullman v. Overnite Transportation Co*., 563 F.2d 152 (5th Cir.1977) (personal injury case; no indication of intervening drinking or unsupervised period; permissible to extrapolate back, objections go to weight). Cf. *United States v. DeCoteau*, 516 F.2d 16 (8th Cir.1975) (no indication of intervening drinking or unsupervised period)...." (*Id.* at p. 644.)

In *Mata v. State* (Tex.Ct.App.2001) 46 S.W.3d 902, cited by defendant, the court held the expert's testimony about retrograde extrapolation was unreliable and speculative because it was riddled with inconsistencies that "prevented him from explaining the science to the court with any clarity." (*Id.* at p. 917.) *Mata* clarified that it was not determining "the exact blueprint for reliability in every case." (*Ibid.*)

> "[T]he science of retrograde extrapolation can be reliable in a given case. The expert's ability to apply the science and explain it with clarity to the court is a paramount consideration. In addition, the expert must

18

demonstrate some understanding of the difficulties associated with a retrograde extrapolation. He must demonstrate an awareness of the subtleties of the science and the risks inherent in any extrapolation. Finally, he must be able to clearly and consistently apply the science.

"The court evaluating the reliability of a retrograde extrapolation should also consider (a) the length of time between the offense and the test(s) administered; (b) the number of tests given and the length of time between each test; and (c) whether, and if so, to what extent, any individual characteristics of the defendant were known to the expert in providing his extrapolation. These characteristics and behaviors might include, but are not limited to, the person's weight and gender, the person's typical drinking pattern and tolerance for alcohol, how much the person had to drink on the day or night in question, what the person drank, the duration of the drinking spree, the time of the last drink, and how much and what the person had to eat either before, during, or after the drinking.

"*Obviously, not every single personal fact about the defendant must be known to the expert in order to produce an extrapolation with the appropriate level of reliability*. As the Kentucky Supreme Court has recognized, if this were the case, no valid extrapolation could ever occur without the defendant's cooperation, since a number of facts known only to the defendant are essential to the process." (*Id*. at p. 916, italics added.)

*Mata* did not hold that an expert must know a subject's individualized burn-off rate in order for retrograde extrapolation testimony to be reliable and admissible. In light of *Mata*, McCormick recognized: "Some courts have emphasized the need for care in admitting retrograde extrapolations, but arguments that the extrapolation process itself is so uncertain as to be inadmissible under *Frye* or *Daubert* have not prevailed." (1 McCormick on Evidence (7th ed.2013) § 205, fn. omitted, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc*. (1993) 509 U.S. 579 & *Frye v. United States* (1923) 293 F. 1013.)

The other cases cited by defendant are not helpful to his claims. In *People v. Emery* (Colo.1990) 812 P.2d 665, defendant argued the prosecution's expert testimony on retrograde extrapolation was scientifically unreliable. The court declined to address the issue, and held defendant's conviction for driving under the influence was supported by the statutory inference that if a chemical test reveals the defendant's blood alcohol level was above the legal limit within a reasonable time after the alleged offense, the jury may infer defendant was driving under the influence. *Emery* held that since defendant's conviction was supported by the statutory inference, the prosecution's expert testimony regarding retrograde extrapolation was irrelevant and any error was harmless. (*Id*. at pp. 667–668.)

In *Com. v. Loeper* (1995) 541 Pa. 393 [663 A.2d 669], the court held the prosecution's evidence of defendant's intoxication was too speculative because it was based on the officer's description of defendant's behavior, and the blood test taken several hours after he was driving was insufficient to trigger the statutory inference that his blood-alcohol level exceeded the legal limit when he was driving. (*Id*. at pp. 396–399.) In *Com. v. Gonzalez* (1988) 519 Pa. 116 [546 A.2d 26], the court held the expert's testimony was speculative because there was no evidence when defendant consumed his last drink, which undermined his opinion about what defendant's blood-alcohol content might have been when he was driving. (*Id*. at pp. 133–135.)

19

In this case, Deslate was presented with a series of hypothetical questions based on the individualized factors cited by *Mata*—defendant's gender, his height and weight, the amount he had consumed, the time between the crash and the blood test, and the results from both the prosecution and defense blood tests. We thus conclude the court properly admitted Deslate's testimony and defense counsel was not prejudicially ineffective for declining to bring a meritless motion to exclude his testimony based on the absence of his individualized burn-off rate. (*People v. Diaz, supra*, 3 Cal.4th at p. 562.)

Farias, 2014 WL 6066121, at *11–13.

a.  Legal Standard

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test.  Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things.  First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal.  Id. at 694.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial.  Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable.  Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold."  Schriro v.

Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable.  Yarborough v. Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

### b.  Analysis

The state court concluded that the admission of the expert testimony concerning retrograde alcohol extrapolation was proper under California law.  In addition, the state court noted that other states have determined that such evidence is generally reliable and admissible.  That being the case, the state court concluded that any defense motion would have been meritless.  The court determined that counsel did not render ineffective assistance by failing to bring a meritless motion.

Petitioner fails to demonstrate that the state court rejection of his claim was contrary to or an unreasonable application of Strickland.  Since the admission of the testimony was proper, any objection would have been meritless.  As reasonably found by the state court, defense counsel cannot be faulted for failing to bring a meritless motion.  For the same reasons, Petitioner cannot demonstrate prejudice resulting from counsel's alleged error.  Accordingly, the claim should be rejected.

### 3.  Consecutive Terms

Petitioner alleges that the sentencing court erred by imposing consecutive terms rather than concurrent terms for his convictions in counts four and five.  This claim was raised on direct appeal.  The Fifth DCA rejected the claim as follows:

> Defendant contends the court abused its discretion when it imposed consecutive determinate terms for count IV, gross vehicular manslaughter of Rodriguez, and count V, felony driving under the influence causing great bodily injury to Valdez, because the offenses were based on a single course of conduct.

### A.  Background

Defendant was convicted of counts III and IV, gross vehicular manslaughter of Lyon and Rodriguez while intoxicated; count V, driving under the influence causing injury to Valdez; and count VI, driving with a blood-alcohol content of 0.08 percent or greater causing injury to Valdez.

At the sentencing hearing, the court reviewed the probation report, which recommended consecutive sentences for counts III, IV, and V because the offenses were violent felonies and involved multiple victims. The probation report stated Penal Code section 654 only applied to count VI since it involved Valdez, the victim in count V.

Also in the probation report, defendant said the crash was a tragedy because Lyon, his best friend, died in the "terrible accident," but he also was a victim "because now I have to live with this." Defendant stated he was not legally drunk and he would appeal because "[m]y test is as good as DOJ[']s." Defendant stated he completed a DUI class after his 2004 conviction, but admitted that since that time he consumed a pint of whiskey a week. He started using cocaine in 2009, and he was using cocaine every couple of weeks at the time of the crash.

Defense counsel acknowledged the term for count III, gross vehicular manslaughter while intoxicated of Lyon, was 15 years to life. Counsel argued the court should imposed concurrent terms for the other offenses because the crash was an "instantaneous event wherein these folks were killed or injured," it was a single act of violence, and the offenses were not independent of each other. Counsel also asked the court to impose concurrent terms because otherwise defendant (born 1955) would never get out of prison.

The prosecutor replied consecutive terms were appropriate because defendant was convicted of committing crimes of violence against multiple persons, and he was aware of the risks of drunk driving based on the admonishments he received for his prior conviction.

The court found one aggravating circumstance, that defendant's prior performance on probation was not satisfactory because he was convicted of an offense while on probation; and one mitigating circumstance, that defendant successfully completed probation after it had been revoked and reinstated.

The court found that Penal Code section 654 did not apply to counts III, IV, and V because the offenses involved separate victims. It applied to count VI because the offense involved the same victim, Valdez, as in count V.

The court imposed the midterm of two years for count V, driving under the influence causing injury to Valdez, plus a consecutive term of three years for the great bodily injury enhancement. The court stayed the term imposed for count VI, driving with a blood-alcohol content of 0.08 percent or greater causing injury to Valdez.

As to counts III and IV, gross vehicular manslaughter of Lyon and Rodriguez while intoxicated, the court imposed consecutive terms of 15 years to life for each offense, for an aggregate term of 30 years to life plus five years.

### B.  Analysis

22

1

2

3

4

5

6

7

8

9

     Defendant contends the superior court abused its discretion by imposing consecutive instead of concurrent terms for counts III, IV, and V, in contradiction of the California Rules of Court. In making this argument, however, defendant fails to address several well recognized legal principles that are applicable to this case. "[I]t is generally appropriate that a defendant be subject to greater punishment for committing an offense if his or her commission of that offense causes injuries to multiple persons. [Citations.]" (*People v. Weaver* (2007) 149 Cal.App.4th 1301, 1331.) "[V]ehicular manslaughter with gross negligence constitutes a crime of violence against the person. [Citation.]" (*People v. McFarland* (1989) 47 Cal.3d 798, 803.) "[W]here, as here, a defendant commits vehicular manslaughter with gross negligence—an act of violence against the person—he may properly be punished for injury to a separate individual that results from the same incident." (*Id*. at p. 804, fn. omitted.) When the defendant is charged with "vehicular manslaughter as to one victim and drunk driving with injury as to another, the imposition of separate sentences does not violate [Penal Code] section 654...." (*Id*. at pp. 804–805.)

10

*Farias*, 2014 WL 6066121, at *13–14.

11

     a.  Legal Standard and Analysis

12

     It is well-settled that federal habeas relief is not available to state prisoners challenging

13

state law.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("We have stated many times that federal

14

habeas corpus relief does not lie for errors of state law); *Langford v. Day*, 110 F.3d 1380, 1389

15

(9th Cir. 1997) ("alleged errors in the application of state law are not cognizable in federal habeas

16

corpus" proceedings).

17

     Petitioner challenges the state court's application of state sentencing laws.  Such a claim

18

does not give rise to a federal question cognizable on federal habeas review.  *Lewis v. Jeffers*,

19

497 U.S. 764 (1990); *Sturm v. California Youth Authority*, 395 F.2d 446, 448 (9th Cir. 1967) ("a

20

state court's interpretation of its [sentencing] statute does not raise a federal question"). To state a

21

claim, Petitioner must demonstrate that his sentence was "so arbitrary or capricious as to

22

constitute an independent due process" violation.  *Richmond v. Lewis*, 506 U.S. 40, 50 (1992).

23

     Here, Petitioner fails to show that his sentence was so arbitrary as to violate his due

24

process rights.  His claim is premised entirely on a violation of state law.  Therefore, Petitioner

25

fails to state a cognizable federal claim and it should be denied.  *Poland v. Stewart*, 169 F.3d 573,

26

584 (9th Cir. 1998) (a petitioner may not transfer a state law issue into a federal one merely by

27

asserting a violation of due process).

28

*///*

**IV.      RECOMMENDATION**

Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus be **DENIED** with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. **Within 21 days** after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within 10 days after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   __April 5, 2017__                                  _____/s/ Jennifer L. Thurston__
                                                                         UNITED STATES MAGISTRATE JUDGE

24